IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES EQUAL
EMPLOYMENT OPPORTUNITY
COMMISSION,

    Plaintiff,

    v.

GBMC HEALTHCARE, INC., *et al.*,

    Defendants.

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

CIVIL NO. JKB-24-2803

## MEMORANDUM

Defendants GBMC HealthCare, Inc. and Greater Baltimore Medical Center have filed a Motion for Summary Judgment. (ECF No. 66.) Plaintiff United States Equal Employment Opportunity Commission has filed a Motion for Leave to File Sur-Reply. (ECF No. 73.) No hearing is necessary. Both motions will be denied for the reasons stated herein.

## I. *Factual Background*

Charging party Jennifer Hoffman is a nurse who applied for a Registered Nurse I ("RN I") position in the Greater Baltimore Medical Center ("GBMC") Medical Intensive Care Unit ("MICU"). She was offered a position, and the offer was ultimately rescinded for reasons she alleges were discriminatory and retaliatory as described in more detail below.

### A. GBMC MICU and the RN I Position

Nurses in the MICU care for both intensive care patients and intermediate level care patients. (Oseromi Dep. Tr. at 31.) Intensive care patients are those who are "critically ill" and "could be intubated with a vent . . . helping with respirations." (*Id.* at 32.) Intermediate care patients are "not on a vent" but are "there to be monitored." (*Id.* at 32–33.) The nurse-to-patient

ratio depends on the level of care required by the patient. (*Id.* at 35 ("So if we have ICU [intensive care unit] level of care, it's two patients to one RN. If we have intermediate, IMC [intermediate care], [it's] three patients to one RN. If we have a patient CRT [continuous renal therapy], it's one to one.").)

The job description for the MICU RN I position provides certain physical requirements, including "lifting and positioning patients up to 50% of work time." (Def. Ex. 1.) Temitope Oseromi (nurse manager of the MICU) testified at her deposition that "[l]ifting means you have to partially lift to reposition a patient" and that the nurses "do that all the time." (Oseromi Dep. Tr. at 170.) Nurses must "do a little pull" to listen to patients' lungs and to bathe patients. (*Id.*) Nurses must also reposition patients to "prevent skin breakdown." (*Id.*) Hoffman also testified that nurses must be able to reposition patients. (Hoffman Dep. Tr. 121.)

Patients in the MICU are "monitored 24/7" and require regular testing and assessment. (Oseromi Dep. Tr. at 28–29.) Deposition testimony reflects that patients must be accompanied by a nurse whenever they go off-unit, due to "the acuity of the patient" and the fact that "the patient has to be monitored all the time." (*Id.* at 106 (Oseromi testifying that the assigned nurse must travel with the patient); *see also* Oseromi Aff. ¶ 10 ("Because [MICU] patients are on heart monitors, a nurse must travel with a patient anytime that the patient is off the unit in order to track and monitor the patient's cardiac rhythm and manage any specialized medications that the patient may be on."); Hoffman Dep. Tr. at 115 (testifying that "all ICU patients have to be accompanied by a RN to wherever -- anytime they're off the unit.").) Oseromi also explained that "[a]ccompanying critical care patients while they are off the unit is a core responsibility of nursing, as the nurse must be present with the patient to which the nurse is assigned because, in the event of an emergency, it is the nurse's job to begin lifesaving care." (Oseromi Aff. ¶ 11.) Further,

2

because the nurse assigned to a particular patient "know[s] the patient best," that nurse is "best suited to accompany a patient off the unit." (*Id.* ¶ 12.)

Oseromi also testified that nurses in the MICU travel with the patient if the patient needs to get an MRI. (Oseromi Dep. Tr. at 106.) Hoffman testified that it is possible for a patient to have an emergency need for an MRI and that it is not possible for a nurse to give report (which is a synopsis of the patient's information, including chief complaint, diagnoses, medications, a description of the patient's symptoms, and other information) during an emergency. (Hoffman Dep. Tr. at 113–14.)

MRIs have four "zones." MRI Zone 1 is public and is "[f]reely accessible to [the] general public." (Pl. Ex. D at GBMC-000742.) MRI Zones 2 and 3 are "[p]atient preparation zone[s]" and are the areas from which the patient is escorted. (*Id.* at GBMC-000744.) MRI Zone 4 is the "magnet room" and where "[f]ree access by unscreened individuals and/or equipment can result in serious injury or death." (*Id.* at GBMC-000749.) It is referred to as an "Exclusion Zone." (*Id.*) Oseromi testified that "[n]urses . . . don't go into MRI Zone four." (Oseromi Dep. Tr. at 74; *see also id.* at 202 ("I mean nurses don't access zone four."); *id.* ("Nurses do not access zone four.").)

### B. Hoffman's Application, Offer, and Accommodation Request and Denial

In February 2023, Jill Silbert (a former GMBC nurse manager), texted Oseromi, recommending Hoffman for a position in the GBMC MICU. (Pl. Ex. E.) Later in February 2023, Hoffman applied for that position. (Pl. Ex. B.) Hoffman had several interviews, including with Oseromi. (Hoffman Dep. Tr. at 75, 80–82.) Oseromi selected Hoffman for the RN I position. (Oseromi Dep. Tr. at 139.) At the time that Oseromi selected Hoffman for the position, she did not know that Hoffman was deaf or that Hoffman planned to ask for any accommodation. (*Id.* at 141–42.)

Hoffman received an offer of employment on March 6, 2023. (Def. Ex. 3.) The offer letter noted that the offer was "contingent upon satisfactory completion of" various items, including a "health assessment." (*Id.*) On March 13, 2023, Hoffman attended her health assessment appointment with GBMC's Employee Health Services ("EHS"). (Hoffman Dep. Tr. at 136.)

As part of the health assessment, Hoffman completed a Pre-Employment Health Screen form. (*Id.* at 136–39.) That form reflects that Hoffman requested the following accommodations: (1) "Nurse available to take pt. to MRI due to cochlear implant"; (2) "outlet available to charge CI batteries"; (3) "'Hard of Hearing' badge during codes/rapid responses"; and (4) "Emergency # to text for call out in case of implant failure." (Def. Ex. 4.) These are the only accommodations she requested. (*Id.*) The form otherwise notes that she has no other impairments or problems, and that she has no restrictions with respect to lifting. (*Id.*)

GBMC then requested that Hoffman have her medical provider complete certain paperwork relating to her requested accommodations. Cindi Beanland, a nurse practitioner, completed the Health Care Provider Assessment Form and associated documentation. (Def. Ex. 6.) She listed "deafness corrected by cochlear implant" as Hoffman's impairment. (*Id.*) She listed under "Restrictions" that Hoffman "[c]annot enter MRI Zone 4 due to cochlear implant." (*Id.*) She listed the following under "Accommodation Needed":

(1) RN should not escort/accompany patient to MRI testing due to the fact that in the event of an emergency, this RN cannot safely enter Zone 4 to begin ACLS [advanced cardiac life support] protocol. <u>Suggestion:</u> Have another RN escort patient to MRI and have this RN (Jennifer Hoffman) provide coverage for the other nurse's patient assignment while the RN is off the floor.
(2) RN should wear "Hard of Hearing" badge during codes so that all team members are aware and know to speak clearly & directly to this RN.
(3) This RN should be provided access to power outlet to re-charge cochlear implant throughout her shift.
(4) This RN should be provided a direct way to text-contact a supervisor in case she needs to call out of work in the event of an implant failure.

4

(*Id.*) The form also includes the following under the heading "Please identify the specific activity the employee may perform associated with their current position":

| Lifting or Carrying: | Never 0 % of the Time | Occasionally 1-33% of Time | Frequently 34-66% of Time | Continually 67-100% of Time |
|---|---|---|---|---|
| A. Up to 10 lbs. | | | X | |
| B. 11-20 lbs. | | | X | |
| C. 21-50 lbs. | | X | | |
| D. 51-100 lbs. | | X | | |

(*Id.*) Hoffman submitted the paperwork to GBMC. (Hoffman Dep. Tr. at 141–42.) Beanland testified at her deposition that, to her knowledge, Hoffman was able to perform the physical requirements of a registered nurse position. (Beanland Dep. Tr. at 73.) She also testified that Hoffman did not have any physical restrictions. (*Id.*) She testified that she completed the table above the way she did because that "seemed like reasonable expectations of how much and how frequently someone should be able to or should be expected to lift as . . . an RN" and that "there was no option for me to put no restrictions." (*Id.* at 75.)

On March 15, 2023, Wayne Silver (a GBMC RN) sent Oseromi a tentative work schedule for Hoffman, which notes that Hoffman would start the week of March 19. (Pl. Ex. K.) Oseromi responded at 9:14 a.m. on March 16, 2023 that the schedule "look[ed] good" to her and that she "plan[ned] to place a call out to her today ahead of her start date just in case she has any questions." (*Id.*) Call logs reflect that Oseromi called Hoffman at 1:39 p.m. on March 16 (Pl. Ex. L Row 12.) Hoffman testified as follows about their conversation:

> Yes, it was sometime in late afternoon she called me and she asked me what the holdup was and why I had not been approved for orientation yet. And I told her, well, I have ADA paperwork. And she was like, "Why do you have ADA paperwork?"
>
> And I told her, "I am hearing-impaired. I have a cochlear implant." And her first response was, "Well, I wasn't made aware of this. You didn't tell me this and Jill didn't tell me this." And I asserted to her, "Well, that's not really something I disclose during the interview process."
>
> And then she was like, "All right. Well, what accommodation did you request?" And I discussed the four accommodations that Cindi had written down. I didn't say anything about lifting because to my understanding what Cindi marked wasn't

5

restrictions, it was parameters. Anyways, so I told her these four listed accommodations . . . .

And then her first question to me was, "Well, did you have a hard-of-hearing badge at Sinai?" And I said to her, "No, not really." And she was like, "Well, I'm going to have to talk to HR about the hard-of-hearing badge."

She said first off that might create some confidentiality issues and it might open doors to making people feel uncomfortable.

And I don't know what she meant by making people feel uncomfortable. She didn't specify whether it was the patients or the other employees. And at that point I was like, well, I mean we can work something out here. If you don't want me to wear the badge, I'm sure we can figure something out here. And she was like, "Well, I will talk to HR," then she hung up on me.

(Hoffman Dep. Tr. at 152.)

Shortly after that call, at 2:08 p.m., Oseromi emailed Silver saying: "I was on the call with her and wanted to chime in. Sorry for the last minute run around as I did not anticipate HR will push her through rather quickly. She is however not cleared by HR yet and I am concerned for Monday. Wayne, pls hold off of placing the dates below in shiftwizard if you have not already done so." (Pl. Ex. M.)

The same day, at 2:13 p.m., Julissa Melendez (a GBMC EHS employee) sent an email to Oseromi and Danier Thompson (GBMC Senior Human Resources Business Partner) listing Hoffman's "requested restrictions" based upon the documentation received from Beanland. (Def. Ex. 7.) She listed them as follows:

- Be provided a direct way to text/contact a supervisor during a shift for call outs as needed.
- Should be allowed access to a power outlet throughout their shift.
- Should have a "hard of hearing badge during codes so team members are aware to speak clearly and directly" to employee (Per provider's recommendation)[.]
- No escorting/accompanying patient to MRI testing.
- Lifting 0-20 lbs. is limited to 34%-66% per shift.
- Lifting 21-50 lbs. is limited to 1%-33% per shift.
- Lifting 51-100 lbs. is limited to 1%-33% per shift.
- Duration: Permanent.

(*Id.*) She asked if "the department is able to accommodate the requested restrictions." (*Id.*)

6

Oseromi testified that, when she received Hoffman's accommodation request, Oseromi "engage[d] Employee Health and HR" and "there was a decision that we could not accommodate the lifting accommodations and the travel [to the MRI]." (Oseromi Dep. Tr. at 114–16.) She explained that this was due to patient safety concerns. (*Id.* at 168.) Others testified that Oseromi did not discuss the requested accommodations with HR or EHS and that HR did not get involved until after the accommodations were denied. (Melendez Dep. Tr. at 101; Hayes Dep. Tr. at 51; Thomson Dep. Tr. at 41, 47; Kummelman Dep. Tr. at 71; Niebuhr Dep. Tr. 46, 48.)

Oseromi responded to Melendez's email less than an hour later, at 2:57 p.m., explaining that

> Given the acuity of our patients in the ICUs, intensity of nursing care required, and the level of the requests below, I am afraid that the department **cannot accommodate** these requests at this time. I may mention that I first heard about the ADA request regarding the MRI after I had called the employee ahead of her start date today. Here is my first time hearing about the lifting limitations.

(Def. Ex. 8 (emphasis in original).)

On March 17, 2023, Hoffman reached out to Oseromi. Hoffman's call logs reflect that she placed calls to Oseromi beginning at 1:36 p.m. (i.e., prior to Hoffman being made aware of any decision regarding the requested accommodations). (Pl. Ex. L.) She left Oseromi a voicemail. (Oseromi Dep. Tr. at 194.) Hoffman also reached out to Oseromi via email at 3:52 p.m. to explain that she had still not received clearance from HR to start orientation on March 20, 2023 and that her "ADA paperwork is still under review." (Pl. Ex. S.) Hoffman did not hear from Oseromi. (Oseromi Dep. Tr. 193.)

Melendez emailed Hoffman, also on March 17, 2023 at 4:08 p.m. explaining that "[u]pon review of the restrictions with your department, your department has determined that they are unable to accommodate this restriction due to business operational needs." (Def. Ex. 9.) Hoffman attempted to call EHS "several times" on March 17 after receiving the email from Melendez but the office was closed. (Hoffman Dep. Tr. 156.) She spoke with Melendez the next business day,

7

March 20, 2023. (Hoffman Dep. Tr. 162.) Hoffman testified that she "asked [Melendez] . . . exactly which accommodations were being denied and which ones were the issues" and that Melendez told her that "all of them" were denied. (*Id.*) Hoffman "explained to [Melendez] . . . that, you know, as far as the lifting part goes, my provider did not put that down as restrictions." (*Id.*) Hoffman was directed to call Brandon Lee (the GBMC nurse recruiter with whom she communicated about the RN I position), and Hoffman attempted to do so but "[h]e did not pick up the phone" and later "just sent [her] an e-mail rescinding this job offer." (*Id.* at 163.) Hoffman felt as though she was "trying to engage in the interactive process" but that "no one would talk to [her] and "[t]hey just kind of tried to like blow [her] off." (*Id.*)

In the meantime, Melendez forwarded the email in which Oseromi states that the unit cannot accommodate Hoffman's requests to various GBMC employees. (Def. Ex. 10.) On March 20, 2023, Lee asked if it was "safe to say that we would be rescinding" the offer. (*Id.*) Britney Niebuhr (GBMC Talent Acquisition Manager) explained that "[i]f the department is unable to meet the requirements of the restrictions and this has been an interactive process between the candidate and EHS/HR/manager then she cannot fulfill the role." (*Id.*) Thompson agreed and "advise[d] [Lee] to work with the applicant to identify a position that would be more appropriate." (*Id.*) Tina Kummelman (GBMC HR and Talent Acquisition Director) advised that the offer should be rescinded and that they should "let her know that she can apply for any other positions that meet her skills and abilities (we do not need to provide a list but should direct her to the website and encourage her to apply)." (*Id.*)

Lee emailed Hoffman also on March 20, 2023, stating that: "[a]fter speaking with the unit manager, she is not going to move forward at this time. Due to the nature of the work required in the ICU, we would not be able to meet the permanent restrictions. However, please apply for any

8

other positions that would meet your skills and abilities on our website." (Def. Ex. 11.) Hoffman did not respond to that email. (Hoffman Dep. Tr. at 158.)

## II.    Legal Standard

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of each claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. Rule 56 requires parties to support summary judgment arguments with sufficient citations to the record. Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by [either] . . . citing to particular parts of materials in the record, . . . [or] showing that the materials cited do not establish the absence . . . of a genuine dispute[.]").

## III.    Analysis

The Americans with Disabilities Act ("ADA") imposes liability on employers who do not make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). A "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential

9

functions of the employment position that such individual holds or desires." *Id.* § 12111.

Defendants move for summary judgment on Plaintiff's ADA failure to accommodate and

retaliation claims.

"The heart of a claim for failure to accommodate" is "whether, with a reasonable

accommodation, [the employee] could perform the essential functions of the position[.]" *Jacobs*

*v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562, 580 (4th Cir. 2015).

> To make out a failure-to-accommodate claim, [a plaintiff] ha[s] to show that "(i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022). We've read the fourth element to require the employer's good-faith participation in § 1630.2(o)(3)'s interactive process. *See Wilson v. Dollar Gen. Corp.*, 717 F.3d 337, 346–47 (4th Cir. 2013).

*Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, 141 F.4th 568, 573 (4th Cir.), *cert. denied*,

146 S. Ct. 367 (2025).

Defendants argue that the Court should grant summary judgment on both of Plaintiff's

claims. With respect to the failure to accommodate claim, Defendants argue that Hoffman could

not perform essential functions of the RN I position, that Hoffman failed to engage in the

interactive process, and that no reasonable accommodation existed. With respect to the retaliation

claim, Defendants argue in essence that, because Plaintiff's failure to accommodate claim fails, so

too must the retaliation claim. Because there exist genuine disputes of material fact that preclude

summary judgment, the Court will deny Defendants' motion.

### A. Factual Disputes Remain as to the Essential Functions of the RN I Position and Whether Hoffman Could Perform Essential Functions With or Without Accommodation

Defendants argue that the ability to lift and position patients and to transport patients to the

MRI are essential functions that Hoffman could not perform with or without reasonable

accommodation. There are genuine disputes of material facts that preclude summary judgment on these points.

> A function is essential as long as it "bears more than a marginal relationship to the job at issue." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279 (4th Cir. 2004) (quoting *Tyndall v. Nat'l Educ. Ctrs., Inc. of Cal.*, 31 F.3d 209, 213 (4th Cir. 1994)); *see also* 29 C.F.R. § 1630(n)(1) (defining an "essential function" as a "fundamental job dut[y]"). The ADA further provides that, in any determination of a position's essential functions, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8).

*Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020). The plaintiff bears the burden of demonstrating that the employee could perform the essential functions of a relevant position. *E.E.O.C. v. Womble Carlyle Sandridge & Rice, LLP*, 616 F. App'x 588, 593–94 (4th Cir. 2015). A plaintiff "satisfies that burden by showing that she could perform the essential functions 'with or without reasonable accommodation.'" *Id.* (quoting 42 U.S.C. § 12111(8)).

### 1. Ability to Lift and Position Patients

Defendants argue that "[t]he ability to lift and position patients is an essential function of the job, as required in the job description, which states that nurses must be able to lift and reposition patients up to 50% of their work time." (ECF No. 66-1 at 26.) They also argue that Hoffman could not perform this function, and that her proposed accommodation was not reasonable. (*Id.* at 29–30.)

The Court agrees that there can be no dispute that some amount of lifting and positioning is an essential function of the RN I position. Indeed, the job description for the MICU RN I position provides the following requirement: "lifting and positioning patients up to 50% of work time." (Def. Ex. 1.) And witnesses uniformly testified that nurses must be able to reposition patients. (*See, e.g.*, Oseromi Dep. Tr. 170 ("Lifting means you have to partially lift to reposition a patient. We do that all the time."); Hoffman Dep. Tr. 121 (testifying that ICU nurses must be able to reposition patients).) However, there remain genuine disputes of material fact as to exactly

11

how much lifting and positioning is required of an RN I. For instance, in response to the question "what is the standard that would make you conclude [Hoffman] could lift patients as an RN on the MICU?" Oseromi responded "I don't know." (Oseromi Dep. Tr. 174.) She testified that "[s]ometimes" nurses can turn patients by themselves and that for "heavier patients, then we get two people." (*Id.* at 174–75.) She also testified that, in some circumstances, nurses can use mechanical lifts. (*Id.* at 178–79.)

Critically, a reasonable jury could conclude that Hoffman was able to lift and position patients as required by the RN I position without any accommodation and that she did not seek any accommodation in that regard. Beanland, Hoffman's medical provider, did not list any lifting-related restrictions under the "Accommodations Needed" section of the form she completed. (Def. Ex. 6.) Hoffman herself requested no lifting-related accommodations in her employment-related paperwork, and she indicated that she had no lifting restrictions. (Def. Ex. 4.) And when she spoke with Melendez after receiving the email indicating that Hoffman's limitations could not be accommodated, Hoffman explained that she had no lifting-related limitations. (Hoffman Dep. Tr. 162.)

It is true that Beanland indicated in the grid copied above that Hoffman could "Lift[] or Carry[]" 0 to 20 pounds frequently (34-66% of the time) and 21-100 pounds occasionally (1-33% of the time). (Def. Ex. 6.) This was then relayed by Melendez as a "requested restriction" on Hoffman's ability to lift. (Def. Ex. 7.) However, a jury could conclude that Hoffman's ability to "lift or carry" (as provided in the paperwork Beanland completed) is not the same as her ability to "lift and position" patients (as provided in the job description). Indeed, the job description refers to "lifting and *positioning* patients up to 50% of work time," but the grid completed by Beanland refers to "lifting or *carrying*" four categories of weight (0-10 pounds, 11-20 pounds, 21-50 pounds,

and 51-100 pounds) for varying percentages of the work time (0%, 1-33%, 34-66%, and 67-100%).[1]

### 2. Ability to Accompany Patients to MRI

Defendants also argue that "the ability to escort patients whenever they are off the unit is an essential function of the job." (ECF No. 66-1 at 26.) There remain genuine disputes of material fact on this point that preclude summary judgment in favor of the Defendants.

While the evidence is consistent that the nurse assigned to a patient should travel with that patient off unit and that nurse is the best-suited to do so, Oseromi testified that nurses do not access Zone 4, the MRI Zone that Hoffman cannot enter due to her cochlear implant. (*See* Oseromi Dep. Tr. 74, 202.) Defendants argue that "[w]hen put in proper context, the testimony shows that Oseromi's comment that nurses do not go into Zone 4 was in reference to typical circumstances—not emergencies." (ECF No. 72 at 14.) However, her testimony regarding entry into Zone 4—at least in the portion that has been excerpted for the Court and cited by the Defendants—does not reflect that nuance and does not differentiate between typical circumstances and emergencies. Her testimony (at least as excerpted for the Court) is as follows:

> Q. Okay. As a nurse who has taken patients down for MRI testing, were you able to go in MRI zone three without any restrictions?
> A. Yes.
> Q. Okay. As a nurse who has taken patients down for MRI testing, have [you] been able to go into MRI zone four without any restrictions?
> A. Nurses should -- we don't go into MRI zone four.
> Q. And why is that?
> A. Because of the magnet, because of safety reasons.
> Q. What type of safety reasons?
> A. Because the magnet is -- you know, employees have to be cleared to go in there because of the magnet. It's active. We don't want things to be flying and hitting people so we don't go there.

---

[1] Defendants' argument that GBMC was entitled to rely on the forms Beanland completed is well-taken. (ECF No. 72 at 5-6.) However, as discussed above, it is not clear that the paperwork actually imposed the purported lifting restrictions on Hoffman. And, as discussed in more detail below, there remain factual disputes about whether there was a failure to engage in an interactive process.

13

(Oseromi Dep. Tr. at 73–74.)

> Q. . . . So you knew that the reason -- did you know that the reason [Hoffman] was requesting somebody else to transfer patients to MRI testing was because she couldn't access zone four? .
> A. I mean nurses don't access zone four.
> Q. What.
> A. Nurses do not access zone four.

(*Id.* at 202.) On the other hand, Defendants point to evidence from Hoffman, Beanland, and Silbert tending to show that nurses may need to enter Zone 4 in the event of an emergency to avoid delaying lifesaving care to a patient. (*See, e.g.*, Beanland Dep. Tr. 62–63; Silbert Dep. Tr. 64–65.)[2]

In addition, Defendants argue that MRI transport may occur on an emergency basis and point to evidence that reflects that, in such an emergency, a nurse could not competently hand off a patient to another nurse because there is not adequate time to provide report. (Hoffman Dep. Tr. at 114.) Plaintiff counters with evidence that tends to show that MRI transport is not as "urgent and unpredictable" as Defendants suggest. (*See, e.g.*, Oseromi Dep. Tr. 64 (testifying that patients who need an MRI get an appointment); Pl. Ex. D at GBMC-000754 (MRI safety document reflecting that if a patient cannot be stabilized or scanned within the allotted time, the MRI will be rescheduled).)

Thus, while testimony was uniform that nurses must accompany patients off-unit and that the nurse assigned to a patient is the best candidate for that task, there remains a genuine dispute

---

[2] For instance, Beanland testified that "as an ICU nurse, [Hoffman] would probably have to accompany her patients to MRI or imaging." (Beanland Dep. Tr. 62.) Beanland explained that, when patients are in the MRI the nurse is "behind like another wall that has glass that you can monitor the patient, but you still have to be the one monitoring the patient and monitoring their heart rhythm" and that a nurse "could potentially have to adjust [medications] even while [a patient is] in the MRI machine." (*Id.*) Beanland also explained that, if a patient experiences an emergency while in the MRI, "you wouldn't want to delay emergency care to a patient, you know, you wouldn't want to have to wait for things to shut down before entering that zone or entering that room." (*Id.* at 63.) Silbert testified that she entered Zone 4 "like one time" and that nurses monitor patients from Zone 3 and that "you're there a lot." (Silbert Dep. Tr. 64–65.) However, as Plaintiff points out, "Beanland has never worked at GBMC" and Silbert's testimony that she entered MRI Zone 4 one time referred to her time "in the ICU Step-Down Unit . . . but Silbert worked in that unit at Sinai, not GBMC." (ECF No. 71 at 21.)

of material fact as to whether MRI transport, and specifically entering MRI Zone 4, was an essential function of an RN I in the GBMC MICU. To the extent that a finder of fact concludes that having the ability to enter MRI Zone 4 was not an essential function, they could also conclude that Hoffman needed no accommodation in that regard. Of course, to the extent that a finder of a fact concludes that having the ability to enter MRI Zone 4 to care for a patient was an essential function, "[t]he ADA does not require an employer to reassign any of the essential functions of a disabled employee." *Stephenson v. Pfizer, Inc.*, 641 F. App'x 214, 219 (4th Cir. 2016); *see also Elledge*, 979 F.3d at 1013 ("[E]mployers do not need to change a job's essential functions or split them across multiple employees.").

The Court is aware that Hoffman requested to be excused from transporting patients altogether. However, a reasonable jury could conclude that her disability did not prevent her from transporting patients altogether and that, rather, her disability prevented her only from entering MRI Zone 4 and, as explained below, the duty of an employer to engage in the interactive process "is triggered when an employee communicates her disability and desire for an accommodation— even if the employee fails to identify a specific, reasonable accommodation." *Jacobs*, 780 F.3d at 581.

### B. Factual Disputes Remain as to Whether Defendants Failed to Engage in the Interactive Process

The relevant regulations provide:

> To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o)(3). And "[t]he duty to engage in an interactive process to identify a reasonable accommodation is generally triggered when an employee communicates to his employer his disability and his desire for an accommodation for that disability." *Wilson v. Dollar*

15

*Gen. Corp.*, 717 F.3d 337, 346 (4th Cir. 2013). As just noted, "[t]his duty is triggered when an employee communicates her disability and desire for an accommodation—*even if the employee fails to identify a specific, reasonable accommodation.*" *Jacobs*, 780 F.3d at 581 (emphasis added). "The interactive process helps employers to discharge their duty to accommodate" and "give[s] employers and employees a chance to work together to figure out what accommodation, if any, would be reasonable and not unduly burdensome." *Tarquinio*, 141 F.4th at 574.

Further, "the employee must demonstrate that the employer's failure to engage in the interactive process resulted in the failure to identify an appropriate accommodation for the disabled employee." *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011); *see also Gagnon v. Bd. of Educ. of Montgomery Cnty.*, 760 F. Supp. 3d 359, 373 (D. Md. 2024) ("A failure to engage in the interactive process . . . may result in liability only if that process could have identified a reasonable accommodation that would have enabled the plaintiff to perform the essential functions of the position.").

Defendants argue that engagement in an interactive process would not have changed the outcome, given that no reasonable accommodation existed. As discussed above, however, a reasonable juror could conclude that Hoffman did not even need or request an accommodation with respect to lifting, and a reasonable juror could conclude that entering Zone 4 was not an essential function.

A reasonable juror could also conclude that no interactive process occurred. Defendants argue that this was because Hoffman made minimal effort to contact them after her accommodation requests were denied. While a reasonable juror could agree, a reasonable juror could also conclude that it was Defendants that failed to engage with Hoffman, given the evidence in the record of Hoffman's various attempts to contact Oseromi, Melendez, and Lee. Oseromi never contacted Hoffman following Hoffman's attempts to contact her leading up to her start date, Melendez told

16

Hoffman to contact Lee, and Lee did not return Hoffman's call but rather followed up with an email explaining that Oseromi was "not going to move forward at this time" and that "we would not be able to meet the permanent restrictions." (Def. Ex. 11.)   Summary judgment is not appropriate given these facts. *See, e.g. Wilson v. Bd. of Educ. of Prince George's Cnty.*, Civ. No. 12-2092-AW, 2013 WL 3146935, at *5 (D. Md. June 18, 2013) (collecting cases and concluding that "in the bulk of cases in this District where summary judgment was granted based on the employee's failure to participate in an interactive process, there was no evidence whatsoever that the employee even attempted to engage the employer").

Thus, based upon the foregoing, Defendants' motion will be denied as to its request for summary judgment on the failure to accommodate claim.

### C. Defendants Have Not Carried Their Burden as to the Retaliation Claim

Defendants also move for summary judgment on Plaintiff's retaliation claim.   However, Defendants' argument with respect to the retaliation claim assumes that the Court will grant summary judgment on the failure to accommodate claims. (*See* ECF No. 66-1 at 34 ("While it is true that requests for accommodation are protected activity under the ADA . . . GBMC's determination based on that activity itself was a completely legitimate and a legal employment decision.").)   This is insufficient to carry Defendants' burden on a Rule 56 motion, and the motion will be denied as to the retaliation claim.

### IV.   *Motion for Leave to File Sur-Reply*

Plaintiff filed a Motion for Leave to File Sur-Reply. (ECF No. 73.)   The motion will be denied. Plaintiff explains that "GBMC's Reply raises an affirmative defense—for the first time— by arguing that Hoffman's requested accommodations would cause an 'undue hardship.'" (ECF No. 73 at 3.)   However, while GBMC uses the term "undue hardship" in its Reply for the first time, GBMC does not appear to be raising an undue hardship affirmative defense, but rather

centers its argument on its view that Hoffman's requested accommodations were not reasonable. In any event, Plaintiff is not prejudiced given that Defendants' Motion for Summary Judgment will be denied. Further, Plaintiff's submission of the Motion for Leave to File Sur-Reply was extremely tardy, having been filed about three weeks after the Defendants' reply was filed. The motion is also denied on that basis alone.

## V.    *Conclusion*

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 66) and Plaintiff's Motion for Leave to File Sur-Reply (ECF No. 73) will be denied. The parties will be directed to contact Judge Coulson's chambers to reschedule a settlement conference,[3] and a status/scheduling conference will be set in with the undersigned to set in further dates and deadlines in this case. A separate order shall issue.

DATED this  16  day of April, 2026.

BY THE COURT:

James K. Bredar
United States District Judge

---

[3] Judge Coulson ordered that "the settlement conference [originally scheduled for February 18, 2026] will be reset in the event the case is not disposed of following a decision in this matter regarding Defendants' pending dispositive motion. The parties should contact the undersigned's chambers to reschedule if the case remains after a decision on dispositive motions." (ECF No. 68.)